**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

RAYMOND G. SCHREIBER REVOCABLE
TRUST, and ROBERT SCHREIBER,

     Plaintiffs,

v.

ESTATE OF ROBERT KNIEVEL p/k/a EVEL
KNIEVEL, KELLY KNIEVEL, K AND K
PROMOTIONS, INC., and CONANT
INVESTMENT COMPANY, LLC,

     Defendants.

2:05-cv-0574-LDG-PAL

<u>**MEMORANDUM OF DECISION**</u>

     Following the denial of motions for summary judgment (#96, #134), this matter was tried to the court and, in lieu of presenting closing arguments, the parties submitted post-trial briefs (plaintiffs' #219, defendants' #221, plaintiffs' response #222). Pursuant to Fed. R. Civ. P. 52, the court hereby renders this memorandum of decision, in which are incorporated its findings of fact and conclusions of law.

     This litigation arises out of claims related to intellectual property rights in the recorded media of late Robert Knievel's ("Knievel") daredevil and stunt performances, certain identified artworks, and his autobiography. The court notes that though the Raymond G. Schreiber Revocable Trust was substituted as a plaintiff following the death of Raymond Gary Schreiber, to avoid confusion, this opinion will continue to refer to Raymond Gary Schreiber ('Schreiber") as an individual plaintiff.

Plaintiffs' claims are principally based on a "Bill of Sale" dated December 1982, between Knievel and plaintiffs R. Gary Schreiber and Robert Schreiber purportedly assigning to plaintiffs rights to certain of Knievel's performances ("film rights bill of sale"); a "Bill of Sale" dated December 1982, between Knievel and plaintiffs purportedly transferring and assigning all rights in listed works of fine art authored by Knievel ("art works bill of sale"); and an "Assignment" dated December 1982 between Knievel and plaintiffs transferring and assigning Knievel's autobiography to plaintiffs ("autobiography assignment").  Plaintiffs' claims for relief include a declaratory judgment determining the ownership rights to the intellectual property, breach of contract, breach of good faith and fair dealing, fraud, intentional interference with prospective contractual advantage and breach of duty, unjust enrichment, unfair business practices, constructive trust based on fraud, and conspiracy.  Defendants assert counterclaims including declaratory judgment related to copyright filings, intentional interference with prospective economic advantage, punitive damages, and deceptive trade practices.

The trial in this matter was conducted over 25 years after the above-identified principal transactions involving Knievel's property were initiated, and after Knievel's death in 2007.  The court notes that over the years, and through this litigation, the opposing parties have attempted to strengthen their claims to the intellectual property in question.  However, the ultimate question of the validity and enforceability of the original agreements was not addressed until trial, and it is that analysis that is the natural starting point for the court.

The parties assert separate positions regarding the formation of the three contracts. Plaintiffs assert that each contract is separately enforceable; defendants claim that the contracts were never meant to stand alone, but were part of an overall agreement related to an association between the parties for the development of Knievel's artwork.  In light of the court's determination regarding the formation and enforceability of the individual contracts, it need not reach the issue of whether all of the claimed contracts were part of an overall agreement.

2

1    The autobiography assignment expressly states that it shall be interpreted, construed and

2    enforced in accordance with Ohio law.  The other two documents, the performance media

3    agreement, and the art works assignment, contain no such choice of law provision.  The parties do

4    not dispute, however, that Ohio law is applicable to the interpretation of all of the contracts.

5    Morever, Nevada has adopted the substantial relationship test to determine the choice of law in a

6    contract case.  Consolidated Generator-Nevada v. Cummins Engine Co., Inc., 114 Nev. 1304, 1306,

7    971 P.2d 1251, 1253 (Nev. 1998).  The identified factors of that test--the place of contracting; the

8    place of negotiations; the place of performance; the location of the subject matter; and the residence

9    of the parties; favor a determination that Ohio law should be applied to the interpretation of the

10   contracts.

11   I.    Film Rights Bill of Sale

12        The film rights bill of sale is captioned, "Bill of Sale."  However, the terminology of this

13   document contains features of both a bill of sale and an assignment.  The document identifies

14   Knievel as the "Assignor," and Gary Schreiber and Robert Schreiber (each mistakenly spelled

15   "Schriber") as the "Assignees."  Pursuant to the document, Knievel,

16        [F]or the sum of one dollar ($1.00) and other valuable consideration and paid, the receipt of

17        which is hereby acknowledged, by these presents does hereby sell, assign, and transfer unto

18        R. Gary Schriber and Robert Schriber (hereinafter "Assignees"), their respective heirs,

19        executors, personal representatives, and assigns, the following described property:

20        . . . ."

21        The parties agree that to prove the existence of a contract, "the parties to the contract must

22   consent to its terms, there must be a meeting of the minds of both parties, and the contract must be

23   definite and certain." Zelina v. Hillyer, 165 Ohio App. 3d 255, 258-59, 2005-Ohio-5803, 846

24   N.E.2d 68, 70 (Ohio Ct. App. 2005) (quoting Purdin v. Hitchcock, 1993 WL 19508, at *3 (Ohio Ct.

25   App. Jan. 21,1993). "Essential to a valid contract formation is a meeting of the minds of both

26

3

parties as to the essential terms of the contract, such that 'a reasonable person would find that the parties manifested a present intention to be bound by an agreement.'" <u>Zelina</u>, 65 Ohio App. 3d at 259, 2005-Ohio-5803, 846 N.E.2d at 70 (quoting <u>Telxon Corp. v. Smart Media of Delaware, Inc.</u>, 2005-Ohio-4391, 2005 WL 2292800 at ¶ 40 (Ohio Ct. App. 2005)).  Whether or not there has been a meeting of the minds is a question of fact to be determined from all the relevant facts and circumstances." <u>Jackson v. Bellomy</u>, 2000 WL 329039, at *6 (Ohio Ct. App. March 30, 2000).

Similarly, "for an assignment to be valid, it must comply with the fundamental requirements of a contract." <u>Sanderson v. Ohio Edison Co.</u>, 1996 WL 629478, at *10 (Ohio Ct. App. Nov. 1, 1996).  An assignment, no matter how informal, may be found when there is intent on the part of the assignor to assign the rights in question, an intent on the part of the assignee to be assigned the rights in question, and valuable consideration exchanged.  <u>Morris v. George C. Banning, Inc</u>., 77 N.E.2d 372, 374 (Ohio Ct. App. 1947).

A.    <u>Meeting of the Minds</u>

Whether the film rights bill of sale is construed as a contract or an assignment, it suffers from a lack of a showing of the meeting of the minds of the named parties.  During trial, Robert Schreiber, a named assignee in the document, testified that he personally "never entered into any agreement with Knievel."  Trial testimony of Robert C. Schreiber, p. 8, line 21.  This testimony was not challenged.  The court finds Robert Schreiber's testimony highly credible, given that his testimony was against his own potential interest, as a named assignee and party to the litigation.  Morever, in his trial testimony, R. Gary Schreiber testified that his brother Robert should not have even been named in the film rights bill of sale.  Trial testimony of R. Gary Schreiber, p. 143, lines 2-4.

"If more than two persons are intended to be parties to a proposed contract, the contract does not come into being unless all parties manifest their assent.  1 Corbin, Section 12;  Restatement, Contracts (2d), Section 23." <u>Williams v. Quarles</u>, 1990 WL 71522, at *3 (Ohio Ct. App. May 31,

4

1990).  The court finds that because the film rights bill of sale lacked the assent of one of the three identified parties to the purported agreement, there was no meeting of the minds of the contracting parties.  Nor can the court find an intent on the part of all the assignees, including Robert Schreiber, as exhibited in the document or from the relevant facts and circumstances, to be an assignment of the rights in question.

Even if the film rights bill of sale were construed to have been between only Schreiber and Knievel, the evidence at trial indicates that neither of these individuals consistently acted as if the film rights bill of sale conveyed the rights in question.  Throughout the litigation and in his testimony at trial, Schreiber insisted that he alone had purchased all of Knievel's film rights, as evidenced by the film rights bill of sale.  Yet, in certain agreements subsequent to the supposed film rights sale, Schreiber did not hold himself out as the sole personal owner of the film rights.

In an agreement dated December 3, 1985, between Parkinson-Swartz I, Inc., Robert Knievel, and the Legend's Corporation, and executed by, among others, Knievel, individually, and Schreiber, under authority of the board of directors of Legend's Corporation, the parties state that "Legend's is the sole and exclusive owner of all right, title and interest in and to certain film and tape footage described in Exhibit "A" (called the "Masters")."  Defendants' Exhibit S, page 1.  Schreiber, thus, does not describe the film rights as being personally owned, but rather as being owned by Legend's. In addition to indicating at numerous points that Knievel would not transfer rights to the masters outside of the agreement, the  Parkinson-Swartz contract also represents that

> Knievel has transferred all of the copyrights in the Masters and Knievel's full right, title and interest in the Masters to R. Gary Schreiber and Robert Schreiber and not to any other person or entity.  R. Gary Schreiber and Robert Schreiber have transferred all of their right, title and interest in the Masters to Legends.

Defendants' Exhibit S, page 4.

1    The court finds it dubious that Schreiber would claim to have understood that he personally

2    owned all of the film rights as a result of the film rights bill of sale when, according to this

3    agreement, Knievel consented not to transfer those rights, and Schreiber states that he transferred all

4    the rights which he claimed to Legend's.

5    In a letter dated June 6, 1997, from Michael Swartz to Schreiber, Swartz states the

6    following;

7    Ron Davis said that you agreed to call Evel and tell him about the arrangement for the sale

8    of the Evel programs: advance each to Evel and you, no royalty for you and a royalty for

9    Evel and Evel's willingness to promote the sale of the video.  Ron keeps calling me to find

10   out if you have spoken to Evel and if things are still moving forward.  Again, I think that the

11   news of the sale is best told to Evel from you.  Please advise.

12   Defense Exhibit JJ.  This communication to Schreiber clearly indicates that Knievel would be paid a

13   "royalty" in addition to $5000.  During his trial testimony, Schreiber claimed to have no recollection

14   of the correspondence.  Furthermore, under the license agreement dated July 11, 1997, between the

15   Legend's Corporation and White Star Entertainment, directed at the distribution of three previously

16   made programs, The Last of the Gladiators, Evel Knievel's Greatest Hits, and Evel Knievel,

17   American Daredevil, the licensee agreed to pay a royalty of 7 ½% to both Schreiber and Dare Sports

18   Entertainment Co., which was Knievel's company.  The fact that Schreiber, as president of

19   Legend's Corporation, agreed to a "royalty" split with Knievel is a clear indication that Schreiber

20   did not claim complete ownership of the Knievel film rights.

21   Another aspect of the White Star Entertainment license agreement raised significant

22   controversy during trial.  Plaintiffs' copy of that agreement, at Plaintiffs' Exhibit 45, is a six-page

23   document which concludes with the signatures of Schreiber on behalf of Legend's Corporation,

24   dated July 25, 1997, and Dennis Hedlin, on behalf of White Star Entertainment, dated July 24,

25   1997.  Defendants' copy of the agreement, at Defendants' Exhibit KK, is a seven-page document

26

6

1   with the sixth page concluding with the signatures of Schreiber and Dennis Hedlin as described

2   above, except that the Schreiber signature is dated July 25, 1997, while the Hedlin signature is dated

3   July 15, 1997.  While both documents contain the signature of Schreiber dated July 25, 1997, it is

4   apparent that the signatures are not duplicates.

5        Defendants' document also includes a seventh-page recital above Knievel's individual

6   signature, dated August 1, 1997.  That recital is as follows:

7        In consideration for the execution of the above Agreement, Robert Craig Knievel (RCK),

8        a.k.a. Evel Knievel warrants to Licensee the following:

9        1.  That RCK owns all copyrights and other rights in and to the Programs.

10       2.  RCK owns, controls and has cleared completely all rights contained in the programs and

11       has obtained all necessary licenses and permissions required for manufacture, distribution,

12       sale, marketing, advertising and exploitation of the programs throughout the territory and

13       grants these rights to Licensee.

14       3.  Neither the Programs nor the titles thereof, as submitted by RCK, nor the exercise by

15       Licensee of any of the rights granted it hereunder, does or will violate or infringe upon the

16       trademark, name copyright, literary, dramatic, musical artistic, personal civil or property or

17       rights of privacy or any other right of any person or entity.

18       4.  If any third party claims of rights violations or breach occurs, and RCK has knowledge of

19       the situation and is familiar with the parties involved, RCK will personally endeavor to

20       resolve and settle any such disputes and warrants to the Licensee that there will be no

21       disruption of product distribution throughout the duration of any such claims.

22        As the Schreiber signatures and several other variations pointed out by defendants, and the

23   differently dated Hedlin signatures indicate, the two White Star License Agreements are not exact

24   copies of the same agreement even without consideration of the final-page Knievel recital.  During

25   his trial testimony, Schreiber was adamant that he had not seen the final-page Knievel recital, and

26

1   therefore, had not consented to its terms.  In fact, plaintiffs point out that the facsimile cover page

2   indicated that only six pages of the agreement were distributed to a number of individuals, including

3   Schreiber and Knievel, on July 24, 1997, after the signature of Hedlin, but before those of Schreiber

4   and Knievel.

5          The issue before the court is not the enforceability of the White Star License Agreement, but

6   whether the parties' conduct after the supposed transfer of the film rights in 1982 clarifies in any

7   respect whether there was ever a meeting of the minds with regard to the supposed transfer.  The

8   court finds that Knievel, in 1997, claimed complete rights to the programs, and since, under the

9   agreement, Knievel was to be advised of the sale of the programs and receive a royalty, his consent

10  would have been anticipated, and his written recital consistent with it.  Those circumstances, along

11  with the proximate dating of the Knievel recital to the other signatures, convinces the court that

12  Schreiber would have been aware of it.

13         The court is cognizant that the evidence supports the conclusion that Knievel attempted on

14  various occasions to lay claim to the film rights or to reassert them in the face of Schreiber's claims

15  to them.  Knievel's efforts may well have included copying a Schreiber signature onto a document

16  in which Schreiber relinquished the film rights back to Knievel.  However, the court also finds that

17  such attempts by Knievel could have been as much a reaction to Schreiber's claims on the property,

18  as to whether a meeting of the minds occurred with respect to the 1982 transfer.  Therefore,

19  plaintiffs' claims related to the alleged forgery by Knievel are not dispositive as to the enforceability

20  of the film rights bill of sale.

21         Another instance in which Knievel was treated as having film rights is the January 28, 2002,

22  correspondence from Schreiber regarding permission to utilize a clip of Knievel in a production of

23  Frank McKlusky, C.I., in which Knievel is identified as the "Artist," and instructs that Knievel sign

24  two copies of the letter and return it to Schreiber.  Defendants' Exhibit SS.  That document

25  expressly warrants that "the consent of no other person . . . other than Evel Knievel is required in

26

order to enable MPI to use the Clip(s)."  In sum, it is evidence such as the Parkinson-Swartz Agreement, the Swartz letter, the White Star License Agreement, and the Schreiber/McKlusky correspondence which makes it apparent that Schreiber did not hold himself out as the individual owner of the film rights, and that he treated Knievel as at least a part owner of the rights in dispute that causes the court to conclude that plaintiffs have not met their burden in establishing that there was a meeting of the minds regarding the film rights bill of sale.  Finally, this conclusion is reinforced by the fact that, over a 25-year period, plaintiffs did not license any individual film clip without the consent of Knievel.

B.      Certainty of Essential Terms

The essential terms of a contract include the identity of the parties, the subject matter, consideration, a quantity term and a price term.  The essential terms are sufficiently certain if they "provide a basis for determining the existence of a breach and for giving an appropriate remedy." . . .  A contract that is "indefinite at the time of its making is not binding." Knoop v. Orthopaedic Consultants of Cincinnati, Inc., 2008-Ohio-3892, 2008 WL 2955393, at *3 (Ohio Ct. App. Aug. 4, 2008) (citations omitted).

The film rights bill of sale, in significant part, purported to transfer the following property:

a)      All interest of Assignor in the motion picture rights and is [sic] more particularly described hereinafter in the recording of certain performances of Assignor.  These performances involve daredevil feats and stunts performed by Assignor.  The motion picture rights intended to include any and all existing or future motion picture media, in any guage [sic], with or without synchronous sound, whether or not produced on film, magnetic video or audio tape or cassette, or other substance or media now or hereafter used for the recording, exhibition, or transmission of motion pictures. Motion picture rights include, but are not limited to, the right to broadcast, exhibit, produce, transmit the applicable motion picture or motion pictures without

1    limitations as to number or media whether television, theatrically, by video cassette

2    or otherwise.

3         The first sentence of the above clause indicates that the subject matter of the transfer is

4    Knievel's interest "in the motion picture rights and is more particularly described hereinafter in the

5    recording of certain performances," which "involve daredevil feats and stunts performed by [Evel]."

6    However, the term "certain performances" is not defined, and which "certain performances" are the

7    subject of the film rights is not "more particularly described" as the clause indicates.  Rather, the

8    clause proceeds to describe the possible characteristics of the media and the extent of the rights as

9    they pertain to the "certain performances."  What is lacking is the identification of the specific

10   performances that the clause entails, which is critical, as there were numerous recorded

11   performances.  This indefiniteness prevents a determination of a breach and an appropriate remedy.

12        In addition, the court notes that the art works bill of sale lists specifically the paintings

13   purportedly sold to the Schreibers, and therefore, the cataloguing of the specific performances

14   referenced in the film rights bill of sale would have been in the ordinary course of the drafting of the

15   documents.  In fact, in the deposition of Jason Blackford, Esq., who represented Schreiber and his

16   company, H&D Steel, Blackford testified that regarding the film rights bill of sale, "Now, this is not

17   a complete document because I thought that there was – the one I saw had a listing of certain – you

18   know, describing very clearly what was transferred."  Plaintiffs' Exhibit 78, p. 10, lines 16-20.

19   While this testimony is not sufficient to establish that a list "describing very clearly what was

20   transferred" ever existed, it supports the conclusion that such a specific list would have been

21   necessary to sufficiently describe the subject matter of the film rights bill of sale.  Due to the terms

22   of the film rights bill of sale describing the subject matter as "more particularly described . . .

23   certain performances" without providing the needed particularity, the court finds that the film rights

24   bill of sale lacks definiteness as to its essential terms.

25

26

1    The indefiniteness of the subject matter of the film rights bill of sale is further highlighted

2    by the evidence presented at trial.  Although Schreiber testified that Knievel provided him with reels

3    of film contemporaneously with the film rights bill of sale, on cross-examination and his prior

4    deposition testimony, Schreiber admitted that he could not identify any film that Knievel had

5    supposedly delivered to him in 1982, or that he had even viewed the film in his possession, which

6    he exhibited in court.  Schreiber's deposition testimony is further instructive because during that

7    examination he stated that he had not received the film in his possession in 1982, when the film

8    rights bill of sale was executed, and that he did not know when he had obtained the footage.  In fact,

9    some of the film in Schreiber's possession was recorded years after 1982, the date that he

10   maintained he received it.  See Trial testimony of R. Gary Schreiber, p. 139, lines 20-25, p. 140-

11   141, lines 1-20.

12   The court highly discounts the indexes of film clips and footage introduced by plaintiffs (at

13   plaintiffs' exhibits 11 and 12) to clarify what the "certain performances" referenced by the film

14   rights bill of sale might be.  These listings were prepared by Schreiber's employee, Jim Diamond, in

15   approximately 2007, twenty-five years after the film rights bill of sale was created, for Evel Videos,

16   a company formed by Schreiber.  Finally, defendants established at trial that the reels of film

17   Schreiber claims were given him by Knievel are not the same as that which was compiled for

18   production of The Last of the Gladiators, but were reels used in the editing of the production.  This

19   further undermines any notion that the subject matter of the film rights transaction was definite at

20   the time the film rights bill of sale was executed.

21   C.    Copyright

22   In order to transfer a copyright, the Copyright Act of 1976 requires a clear, signed, written

23   transfer of ownership an any rights under a copyright.  See 17 U.S.C. § 204(a).  The requirement of

24   a writing under § 204 "ensures that the creator of a work will not give away his copyright

25   inadvertently and forces a party who wants to use the copyrighted work to negotiate with the creator

26

11

1    to determine precisely what rights are being transferred and at what price." Effect Assocs., Inc. v.

2    Cohen, 908 F.2d 555, 557 (9th Cir. 1990).  "The rule is quite simple: If the copyright holder agrees

3    to transfer ownership to another party, that party must get the copyright holder to sign a piece of

4    paper saying so." Id.  See also Konigsberg International, Inc. v. Rice, 16 F.3d 355, 357 (9th Cir.

5    1994) ("The writing should also serve as a guidepost for the parties to resolve their disputes").

6        Here, there is no evidence that Knievel filed for federal copyright protection for the Knievel

7    stunt footage, or that the footage contained the required copyright notices.  Based on the above

8    discussion, the court concludes that the film rights bill of sale does not clearly reflect an assignment

9    or transfer of any copyrighted material; nor does it clearly identify what particular footage is being

10   transferred.  Because plaintiffs have not established that they are the owners of a valid copyright to

11   any Knievel material, they may not maintain their claims based on the film rights bill of sale.

12       Even if there had been a valid copyright assignment by the film rights bill of sale, which the

13   court determines was not made, that copyright would have been for the initial term of the copyright

14   and not the renewal term; and the first term of the copyright to film footage has now expired.  As

15   defendants point out, works created before January 1, 1978, have two distinct terms – an original

16   term of 28 years and a renewal term of 67 years.  See 17 U.S.C. § 304(a)(1)(A).  At the end of the

17   28-year term, the right to renew the work for a further term of 67 years belongs to (I) the author of

18   such work, if the author is living, (ii) the widow, widower, or children of the author, if the author is

19   not living, (iii) the author's executors, if such author, widow, widower, or children are not living, or

20   (iv) the author's next of kin, in the absence of a will of the author.  17 U.S.C. § 304(a)(1)(B) & ( C).

21   The Copyright Act also provides that the parties entitled to a renewal or extension of the copyright

22   in such pre-1978 works may do so regardless of whether any such renewal is actually filed in the

23   U.S. Copyright Office.  17 U.S.C. § 304(a)(2)(A) and (B).

24       The court finds that all of the footage at issue in this case was filmed before 1978 and, as

25   pre-1978 works, the initial term of the copyright for such recordings was 28 years.  The court

26

further finds that the initial term of the copyright to the earliest filmed footage of Knievel's stunt jumps, starting with the December 31, 1967, jump at Caesar's Palace, would have expired on December 31, 1995.  Based on the above discussion of the lack of formation of the film rights bill of sale, and the lack of evidence to the contrary, the court finds that Knievel did not assign a contingent interest in the renewal term of a copyright.  The Knievel stunt footage was not a posthumous work, was not a periodical, cyclopedic, or other composite work, and was not created by Knievel for plaintiffs as "works for hire."  See 17 U.S.C. § 304(a)(1)(B).  Because no copyright to the stunt footage was registered before the expiration of the initial 28-year term, the persons entitled to claim the renewal and extension terms to the copyright in the Knievel film footage are those persons set forth in 17 U.S.C. § 304(a)(1)( C).  Plaintiffs are not such persons entitled to register a claim to the renewed and extended term of the copyright of the Knievel stunt footage. Therefore, even assuming a valid copyright assignment of the Knievel stunt footage had been made to plaintiffs through the film rights bill of sale, the term of that assignment has expired.

While the court has found that the lack of meeting of the minds regarding the film rights bill of sale and the uncertainty of essential terms as to its subject matter preclude Schreiber's assertion of an individual ownership right to the Knievel film rights, as defendants maintain, the evidence shows that Legend's and Knievel jointly owned the copyrights to the documentary compilations, The Last of the Gladiators, Evel Knievel's Greatest Hits, and Evel Knievel's Spectacular Jumps (collectively, the "documentary compilations").

As discussed previously, Legend's and Knievel entered into an agreement with Parkinson-Swartz I, Inc., dated December 3, 1985, in which Legend's and Knievel appointed Parkinson-Swartz as sole producer and distributor of the documentary compilations.  See Defendants' Exhibit S, section 2.  The Parkinson-Swartz agreement indicates that the appointment by Legend's and Knievel to create the audiovisual work is a work made for hire.  See Defendants' Exhibit S, section 20.  The fact that Legend's and Knievel were intended to be equal owners of the documentary

1   compilations is further documented by a November 24, 1986, letter from Jackson Blackford,

2   Legend's' attorney, to Knievel in which Blackford addresses his belief regarding the future royalties

3   for the documentary compilations:

> I strongly suggest that in any sale of the assets of the Legend's Corporation that the
>
> receivable and the rights to royalties be excluded.  I believe that you have already received
>
> monies based upon anticipated receipt of the Twin Towers receivable.  I believe that you and
>
> Gary should split whatever monies might come out of that royalty arrangement in the future.
>
> It also shows a clear business purpose for the Legends Corporation.

9   Defendants' Exhibit AA.

10   The court discounts the testimony of Michael Swartz which suggested that the documentary

11   compilations were solely the property of Legend's.  Swartz admitted that he did not remember

12   clearly the purpose of Legend's, but he thought that it was set up to run Knievel's business.  Trial

13   testimony of Michael Swartz, page 35, lines 8-22.   Morever, the testimony is inconsistent with the

14   documentary evidence indicating that Legend's and Knievel jointly owned the copyrights, and

15   intended to split the royalties.  As part of the judgment in this case, the court will enter an order that

16   Legend's Corporation and K and K Promotions (Knievel's successor) are equal co-owners of the

17   copyrights to the documentary compilations, and shall have equal access to the works in their

18   possession, including approximately 118 reels of film and three Betacam tapes currently secured at

19   a third-party location.

20         D.    <u>Consideration</u>

> Without consideration there can be no contract.  Under Ohio law, consideration
>
> consists of either a benefit to the promisor or a detriment to the promisee.  To
>
> constitute consideration, the benefit or detriment must be "bargained for."
>
> Something is bargained for if it is sought by the promisor in exchange for his
>
> promise and is given by the promisee in exchange for that promise.  The benefit or

14

detriment does not need to be great.  In fact, a benefit need not even be actual, as in the nature of a profit or be as economically valuable as whatever the promisor promises in exchange for the benefit; it need only be something regarded by the promisor as beneficial enough to induce his promise.  Generally, therefore, a court will not inquire into the adequacy of consideration once it is found to exist. . . .

Whether there is consideration at all, however, is a proper question for a court.

Carlisle v. T&R Excavating, Inc., 704 N.E.2d 39, 43,123 Ohio App. 3d 277, 283 (Ohio Ct. App. 1997) (citations omitted).

The consideration relied upon by plaintiffs, i.e., that the Schreibers agreed to pay off Knievel's motor coach in exchange for Knievel's film rights, is not reliably shown by the evidence. Schreiber's testimony is that he paid off the $86,000 GMAC loan for the bus that Knievel already had in his possession.  During trial, the issue arose whether, after paying off the loan, Schreiber either took possession of the bus or resold it which, in either event, would show that the alleged consideration was for the bus, and not the film rights.  Although Schreiber insisted that he never owned the bus nor took possession of it, defendants introduced form 4797 of Schreiber's 1985 tax return, Defendants' Exhibit HHH, which indicates that Schreiber acquired a "motorcoach" on November 15, 1982, the date, in fact, that Schreiber borrowed money to pay off Knievel's bus, see Plaintiffs' Exhibit 10, and sold the motorcoach on February 2, 1985, for $90,000.  Despite Schreiber's testimony that Knievel received all the proceeds from the sale of the bus, and that Schreiber's accountants prepared his tax return in 1985, Schreiber does not deny that he signed the return, and the court credits the official document over Schreiber's testimony of events a quarter century after they occurred.

Finally, as defendants point out, the alleged pay-off for the bus occurred in the middle of November, 1982, weeks before the film rights bill of sale was executed.  "[P]ast consideration

15

1    cannot be a bargained-for benefit or detriment because it already occurred." Id. at 285, 704 N.E.2d

2    at 44. The court finds that the film rights bill of sale was not supported by adequate consideration.

3    II.    Art Works Bill of Sale

4          During trial, defendants claimed no rights to the artwork prints in Schreiber's possession,

5    and conceded that they are his personal property.  Plaintiffs assert that Knievel breached the art

6    works agreement with Legend's because he did not furnish original artwork in some instances, but

7    closely copied pre-existing artworks, thus infringing on them.  Besides suffering from the same lack

8    of meeting of the minds between the three parties to this contract as addressed in the discussion of

9    the film rights bill of sale, the court finds that plaintiffs have not established that the alleged

10   infringing artworks caused specific damages to plaintiffs or Legend's.  Because defendants make no

11   claim to the artwork in Schreiber's possession, however, the court determines that such prints and

12   artwork shall be Schreiber's personal property.

13   III.   Autobiography

14         Similar to the analyses of the film rights and art works bills of sale, the autobiography

15   assignment lacks a meeting of the minds of the contracting parties.  Morever, essential terms of the

16   assignment are indefinite, as the assignment contains no contingent for the non-production of a

17   completed autobiography.  No evidence was presented that Knievel completed an autobiography,

18   and the assignment places no time-frame upon Knievel for such performance.  Knievel did deliver

19   an incomplete outline of his autobiography, Plaintiffs' Exhibit 17, to plaintiffs, and defendants

20   make no claim to the outline.  Therefore, the court rules that it is the personal property of Schreiber.

21   IV.    Statute of limitations

22         Even if the three principal documents supposedly conveying Knievel's rights to plaintiffs

23   were enforceable, the court finds that the statute of limitations would bar recovery.  The court

24   previously ruled that Nevada's statute of limitations are applicable to the claims in this case.  See

25   Docket #96.  Nevada provides a six-year statute of limitations for breach of a written contract, a

26

1    four-year statute of limitations for breach of an oral agreement, and a three-year statute of

2    limitations for claims based on fraud.  Nevada follows the discovery rule, that is, a claim accrues

3    when a claimant knows or should have known the facts giving rise to the claims for relief.  See

4    Bemis v. Estate of Bemis, 114 Nev. 1021, 1025, 967 P.2d 437, 440 (1998).  This action was filed on

5    May 6, 2005.

6           During trial, Schreiber denied having seen Knievel on television using any of his film clips

7    during the appearances.  However, as defendants brought out during cross examination, during

8    Schreiber's previous deposition testimony, he appeared to hedge on the question:

9    Q:      [reading Schreiber's deposition testimony]

10           "Question:  Give me an estimate of how many things you've seen on TV related to

11           Evel since the mid-eighties.

12           Answer:  I don't know.  I've seen quite a few in the last three years.  I don't know.

13           Question:  In the nineties, what would your estimate be for the nineties?

14           Answer: I wouldn't even venture a guess because I don't watch that much television.

15           Question: More than one?

16           Answer: Oh yes.

17           Question: More than a hundred?

18           Answer: I personally haven't seen it but people have told me that.  Every time

19           something happens they tell me, you know, but me personally, no.

20           Question: Let's go with that.  How many times have you been told about things?

21           What would your estimate be in the nineties, just the nineties?

22           Answer: You said if I don't know, tell you I don't know, and I don't have any idea.

23           Question: That's why I'm asking for an estimate.

24           Answer: I don't have any answer.  Why give you an estimate?

25           Question: Fifty times?

26

17

1        Answer: I don't know.

2        Question: Was it more than once?

3        Answer: Oh yes, more than once.

4        Question: More than five times?

5        Answer: Yeah.

6        Question: Do you think it was more than ten?

7        Answer: Probably.

8        Question: More than 25?

9        Answer: I don't know.  Now you're getting to the point where I don't know."

10       Schreiber's testimony that, during the nineties, he heard from others of Knievel's

11   appearances and use of film clips somewhere between 10 and 25 times clearly indicates that

12   Schreiber was aware that Knievel was using film footage before May 6, 1999, six years before the

13   filing of the complaint.  Morever, as discussed previously, the record contains a number of instances

14   in which Knievel claimed in documents or correspondence which would have been seen by

15   Schreiber to have ownership rights to the films, whether or not those documents were legally

16   binding.  For example, in the November 30, 1998, correspondence from Eric Shepherd to Michael

17   Swartz, which according to Swartz' handwritten notations and trial testimony, was forwarded to

18   Schreiber, Shepherd noted that regarding the footage of some of Knievel's performances, "Evel

19   claims he owns it all."  Defense Exhibit PP; Trial testimony of Michael Swartz, page 22, lines 15-

20   19.

21       In addition, Schreiber was indisputably put on notice as early as November of 1998 that

22   uncertainty existed regarding the description of "certain performances" in the film rights bill of sale,

23   see Defendants' Exhibit OO, yet he did not seek a judicial declaration regarding that document until

24   over six years afterward.  Finally, even if Nevada's statue of limitation did not apply in this case, the

25   court finds that any business relationship between Schreiber and Knievel ended well before 1990,

26

18

and claims based on breaches of written contracts would also be barred by Ohio's fifteen-year limitations period.

V.     Copyright Registrations

Based on the above findings by the court, including that Schreiber is not the author of the works, that the works were not made-for-hire, and that he did not acquire rights or legal ownership in the subject works covered by U.S. Copyright Office Registration Certificate No. PA 1-392-509 for Evel Knievel's Spectacular Jumps, and U.S. Copyright office Registration Certificate No. PA 1-390-303 for Evel Knievel's The Last of the Gladiators, those copyrights will be declared invalid, and ordered cancelled.

VI.    Remaining claims

The court finds that other claims not addressed above were not adequately supported by the evidence or otherwise lack merit.

SO ORDERED.

DATED this ____ day of November, 2013.

_____
Lloyd D. George
United States District Judge

19